UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

LEON VENEGAS JR.,

               Petitioner,           Case No. 1:17-cv-173

v.                                 Honorable Robert J. Jonker

SHANE JACKSON,

               Respondent.
_____/

## REPORT AND RECOMMENDATION

       This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Leon Venegas Jr. is incarcerated with the Michigan Department of Corrections at the Carson City Correctional Facility (DRF) in Carson City, Michigan.  On October 23, 2014, an Ingham County Circuit Court jury found Petitioner guilty of one count of unlawful imprisonment, MICH. COMP. LAWS § 750.349b, and one count of domestic violence-third offense, MICH. COMP. LAWS § 750.81(5).  On December 8, 2014, the court sentenced Petitioner as a habitual offender-fourth offense, MICH. COMP. LAWS § 769.12, to 12 to 30 years on the unlawful imprisonment conviction, concurrent to 5 years to 16 years, 8 months on the domestic violence conviction.

       On February 15, 2017, Petitioner filed his habeas corpus petition raising 4 grounds for relief, as follows:

    I.      The trial court denied Petitioner his constitutional rights to self-representation when it ignored his request to represent himself and foreclosed further discussion of the issue.

    II.     The trial court improperly denied Petitioner's repeated requests for substitute counsel even though he and his appointed counsel had a major strategy disagreement, in that counsel refused to even obtain and review

evidence Petitioner wanted to present at trial, and there had been a resulting breakdown in their attorney-client relationship.

III.     Trial counsel's refusal to obtain, despite Petitioner's pleas, impeachment evidence in a trial that hinged on credibility constituted ineffective assistance of counsel that requires a new trial.

IV.     Petitioner was denied his state and federal due process rights where his convictions were obtained through the use of false and perjured testimony by the prosecution[']s witness(s), where his rights to a fair trial were protected by the procedural safeguard in paragraph #6 of the immunity agreement the prosecution had with the witness, Angela Baker[,] that her testimony would be truthful and where the prosecution failed to correct those false statements made this issue a serious error that prejudiced the defense and deprived Petitioner of a fair trial and proves prosecutorial misconduct.

(Pet., ECF No. 1-1, PageID.17-20.)  Respondent has filed an answer to the petition (ECF No. 8) stating that the grounds should be denied because they are without merit.  Upon review and applying the standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA), I find that the grounds are meritless.  Accordingly, I recommend that the petition be denied.

### Discussion

I.     Factual Allegations

Petitioner and the victim of his crimes, Angela Baker, continued an on-again, off-again intimate relationship after Petitioner was released from jail on June 6, 2013.  On the night of June 7, 2013, Ms. Baker drove Petitioner to Moores Park on the south bank of the Grand River in Lansing, Michigan.  (Trial II, Tr. II, ECF No. 9-16, PageID.555-557.)  Both Petitioner and Ms. Baker acknowledge that an argument ensued, but their testimony differed irreconcilably as to the details.  The conflict became physical and there were resulting injuries to Ms. Baker.  Petitioner

2

claims Ms. Baker injured herself, hitting herself in the face and cutting her finger as she tried to pull the keys away from him.  (Trial II, Tr. III, ECF No. 9-17, PageID.622-623, 626.)  Petitioner claims they then spent a couple of hours in the park because they could not find the key.  (*Id.*, PageID.625-626.)

Ms. Baker claims Petitioner injured her, choking her and hitting her, and her finger was cut as she tried to wrest her keys from Petitioner.  (Trial II, Tr. II, ECF No. 9-16, PageID.557-559.)  They remained in the park for several hours; Petitioner would not let her leave.  (*Id.*, PageID.560.)  Ms. Baker moved into the backseat of the car.  (*Id.*)  Petitioner continued to threaten her, and her dog.  (*Id.*)  Eventually, the altercation became physical again and Petitioner hit Ms. Baker in the head.  (*Id.*, PageID.560-561.)   As morning approached, Petitioner began to sober up.  (*Id.*, PageID.561-562.)  Petitioner permitted Ms. Baker to drive to the hospital.  (*Id.*)  At her father's urging, Ms. Baker reported the incident to the police the next day.  (*Id.*, PageID.563.)

The jury credited Ms. Baker's account.

With the exception of habeas issue IV, the petition for relief is not based upon events during that trial, it is based on events that occurred before that trial.  The three-day trial during October of 2014 was the second attempt to prosecute Petitioner for these crimes.  The first trial spanned five days during August and September of 2014.  (Trial I, Tr. I-V, ECF Nos. 9-8, 9-10, 9-12, 9-13, 9-14.)  The jury could not reach a verdict on the two crimes of which Petitioner was eventually convicted.  (Trial I, Tr. V, ECF No. 9-14, PageID.483.)  The jury found Petitioner not guilty of a third charge, retaliating against a witness, MICH. COMP. LAWS § 750.122(8).  (*Id.*)

The matters at issue in habeas issues I, II, and III occurred, principally, during and before Petitioner's first trial.  Thus, some review of the pretrial proceedings is necessary to resolve the issues Petitioner has raised.

3

At the preliminary examination, Ms. Baker told a story that was entirely inconsistent with her report to the police, but eerily similar to Petitioner's trial testimony. (Prelim. Exam. Tr. I, ECF No. 9-2, PageID.137-155.) The court granted a continuance. (*Id.*, PageID.160.) At the continued hearing, the prosecution introduced the testimony of Lansing Detective Richard Reust regarding recorded telephone calls between Petitioner and Ms. Baker that occurred while Petitioner was detained at the Ingham County jail. (Prelim. Exam. Tr. II, ECF No. 9-3, PageID.168-182.) Detective Reust identified several critical inconsistencies between Ms. Baker's preliminary examination testimony and statements made during the telephone calls. (*Id.*) Detective Reust also identified the hospital records, obtained by search warrant, wherein Ms. Baker's description of the events was different than her preliminary examination testimony. (*Id.*, PageID.182-187.) Lansing police officer Corey Campbell also testified regarding Ms. Baker's report of the incident to him. (*Id.*, PageID.192-199.)

After the prosecution rested, Petitioner wanted to put Ms. Baker back on the stand; his counsel did not. (*Id.*, PageID.203-205.) At that point, the court permitted Petitioner to represent himself for the purpose of questioning Ms. Baker. (*Id.*, PageID.205-206.) Petitioner examined Ms. Baker and she again told a story that was consistent with Petitioner's trial testimony and inconsistent with the testimony of Detective Reust and Officer Campbell. (*Id.*, PageID.207-213, 216-218.) The court permitted the prosecutor to amend the charges to include witness retaliation and unlawful imprisonment and then bound Petitioner over for trial. (*Id.*, PageID. 220.)

Petitioner responded to the court's ruling on the record with rude and profane comments. (*Id.*, PageID.221-222.)

Petitioner's preliminary examination counsel continued in his stand-by role at the circuit court arraignment. (Arr. Tr., ECF No. 9-4, PageID.226-227.) However, because the

charges had been amended to include witness retaliation at the preliminary examination, Petitioner's habitual offender status ratcheted the potential penalty to life imprisonment and his counsel was no longer qualified to continue to represent Petitioner at further circuit court proceedings. (*Id.*, PageID.226-227, 235.) The court relieved counsel of his responsibilities as stand-by counsel. (*Id.*, PageID.235.) The court indicated to Petitioner that she would appoint qualified counsel, but if Petitioner wanted to continue to drive the bus, new counsel would not be "stand by" counsel but co-counsel. (*Id.*, PageID.234-239.) Petitioner indicated that he would like new counsel to be primary counsel. (*Id.*, PageID.239.)

The court appointed Mark Taylor who appeared on Petitioner's behalf at the criminal pretrial. (Pretrial Tr., ECF No. 9-5, PageID.246.) At the pretrial the prosecutor asked that Petitioner's bond be revoked because he had violated the court's order and used the phone to make contacts in violation of the court's order. (*Id.*, PageID.246-249.) Counsel advised Petitioner to remain silent. (*Id.*, PageID.254, 261.) Petitioner ignored that advice, again rejecting his counsel. (*Id.*, PageID.262.) He was ultimately held in contempt, multiple times, and removed from the courtroom. (*Id.*, PageID.262-264.) Once again, Petitioner ended his time in the courtroom with a profanity-ridden tirade. (*Id.*)

The court then appointed Petitioner's third and final trial counsel. Nonetheless, Petitioner continued to file his own motions and act on his own behalf. (Mot. Hr'g I Tr., ECF No. 9-6, PageID.269-270.) At a hearing on June 25, 2014, Petitioner indicated his desire to fire his third attorney. (Mot. Hr'g II Tr., ECF No. 9-7, PageID.286.) The court reviewed the file and concluded counsel was pursuing Petitioner's defense vigorously and that Petitioner had failed to provide any cause, such as a breakdown in the relationship, to warrant counsel's removal. (*Id.*, PageID.287-290.)

The first 36 pages of transcript from Petitioner's first trial relate to Petitioner's attempt to represent himself.  (Trial I, Tr. I, ECF No. 9-8, PageID.293-302.)   The bone of contention between Petitioner and his counsel was counsel's strategic decision to forego acquisition and introduction of recorded telephone conversations between Petitioner and the victim that occurred while Petitioner was incarcerated in the Ottawa County Jail.  The Michigan Court of Appeals explained the dispute as follows:

> At the outset of defendant's first trial, defendant pointed out that counsel had still not obtained the phone calls from Ottawa County.  The trial court noted that the parties had discussed the matter and that defense counsel had decided against using the calls on the ground that their content would be prejudicial to defendant.  Counsel stated that he understood that in one call Baker stated that the charges in this case were "payback" for defendant's act of wrecking her truck. Counsel acknowledged that such evidence could be viewed as exculpatory, but he contended that other exculpatory evidence existed and stated that evidence that defendant had been incarcerated for other charges would be prejudicial to defendant.  Defendant again requested the appointment of substitute counsel.  The trial court denied the request.  Thereafter, defendant briefly considered representing himself, but he ultimately decided to proceed with counsel.

(Mich. Ct. App. Op., ECF No. 9-19, PageID.704.)  Even without the Ottawa County Jail calls, counsel obtained an acquittal with respect to one charge and a hung jury on the other two.  (Trial I, Tr. V, ECF No. 9-14, PageID.483-484.)

Nonetheless, at the beginning of his second trial a few weeks later, after counsel failed to sufficiently press Petitioner's argument that there was a mistake in the transcript of the first trial, Petitioner again announced his intention to fire his attorney.  (Trial II, Tr. I, ECF No. 9-15, PageID.488-492.)  This time, the trial judge did not entertain Petitioner's fickleness.  She simply told Petitioner to sit down lest he be removed from the courtroom.  (*Id*., PageID.492.)

The second trial proceeded much like the first; however, this time the jury convicted Petitioner.  (Trial II, Tr. III, ECF No. 9-17, PageID.687-689.)  Petitioner was sentenced as outlined above.  (Sentencing Tr., ECF No. 9-18, PageID.702.)  He directly appealed his convictions to the

Michigan Court of Appeals.  Petitioner filed two briefs on appeal: the first, filed with the assistance of counsel, raised habeas issues I-III (Appellant's Br., ECF No. 9-19, PageID.746); the second, filed in pro per, raised habeas issue IV (Appellant's Pro Per Br., ECF No. 9-20, PageID.856). Petitioner also filed a motion to remand for consideration of his fourth habeas issue contending that his counsel was ineffective for failing to obtain and then use telephone conversations between Petitioner and the victim while Petitioner was incarcerated in the Ottawa County Jail during August of 2013.  (Mot. to Remand, ECF No. 9-19, PagID.727-733.)  In lieu of remanding, the court of appeals agreed to consider the recordings as submitted by Petitioner when considering his ineffective assistance claim.  (Mich. Ct. App. Ord., ECF No. 9-19, PageID.742.)

The Michigan Court of Appeals rejected Petitioner's arguments and affirmed his convictions by opinion entered June 16, 2016.  (Mich. Ct. App. Op., ECF No. 9-19, PageID.703-709.)  Petitioner filed a pro per application for leave to appeal in the Michigan Supreme Court. That court denied leave by order entered January 5, 2017.  (Mich. Ord., ECF No. 9-21, PageID.912.)  Petitioner did not file a petition for certiorari in the United States Supreme Court. (Pet., ECF No. 1, PageID.3.)  He timely filed this petition on February 15, 2017.

II.    AEDPA standard

The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an

unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in

8

their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

III.    Self-representation

Petitioner first complains that, on the first day of his second trial, the trial court would not permit him to represent himself. The Sixth Amendment provides that a criminal defendant shall have the right to the assistance of counsel for his defense. U.S. Const. amend. VI. At issue here is a corollary to that right, the right to self-representation. *Adams v. U.S. ex rel. McCann*, 317 U.S. 269, 279 (1942) ("The right to assistance of counsel and the correlative right to dispense with a lawyer's help are not legal formalisms."). The clearly established federal law regarding self-representation is expressed in two Supreme Court cases: *Faretta v. California*, 422 U.S. 806 (1975) and *Martinez v. Ct. of Appeal of Cal., Fourth App. Dist.*, 528 U.S. 152 (2000).

In *Faretta*, the Court found support for the right of self-representation in the structure of the Sixth Amendment right to the assistance of counsel:

The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense. It is the accused, not counsel, who must be 'informed of the nature and cause of the accusation,' who must be 'confronted with the witnesses against him,' and who must be accorded 'compulsory process for obtaining witnesses in his favor.' Although not stated in the Amendment in so many words, the right to self-

9

representation—to make one's own defense personally—is thus necessarily implied by the structure of the Amendment. The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails.

The counsel provision supplements this design. It speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant. The language and spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant—not an organ of the State interposed between an unwilling defendant and his right to defend himself personally. To thrust counsel upon the accused, against his considered wish, thus violates the logic of the Amendment. In such a case, counsel is not an assistant, but a master; and the right to make a defense is stripped of the personal character upon which the Amendment insists. It is true that when a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy in many areas. . . . This allocation can only be justified, however, by the defendant's consent, at the outset, to accept counsel as his representative. An unwanted counsel 'represents' the defendant only through a tenuous and unacceptable legal fiction. Unless the accused has acquiesced in such representation, the defense presented is not the defense guaranteed him by the Constitution, for, in a very real sense, it is not his defense.

*Faretta*, 422 U.S. at 819-821 (footnotes and citations omitted).  Although the Court recognized a criminal defendant's right to self-representation, it acknowledged that the right was a qualified one.  The Constitutional mandate to provide counsel to a criminal defendant is premised upon the fact that "[i]t is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts."  *Id*. at 834.  Because a criminal defendant representing himself relinquishes that benefit, his waiver must be "'knowingly and intelligently'" made.  *Id*. at 835.  Moreover, the right to self-representation must yield to "'the dignity of the courtroom.'"  *Id*. at 834 n.46.  It is not a license to ignore the rules of procedure or engage in "obstructionist misconduct."  *Id*.

In *Martinez*, 528 U.S. at 152, the Supreme Court concluded that the right of self-representation did not extend to appeals.  In reaching its conclusion, the Supreme Court commented on the scope of the right of self-representation established in *Faretta*, stating:

10

As the *Faretta* opinion recognized, the right to self-representation is not absolute. The defendant must "'voluntarily and intelligently'" elect to conduct his own defense, and most courts require him to do so in a timely manner. He must first be "made aware of the dangers and disadvantages of self-representation." A trial judge may also terminate self-representation or appoint "standby counsel"- even over the defendant's objection - if necessary. We have further held that standby counsel may participate in the trial proceedings, even without the express consent of the defendant, as long as that participation does not "seriously undermin[e]" the " appearance before the jury" that the defendant is representing himself. Additionally, the trial judge is under no duty to provide personal instruction on courtroom procedure or to perform any legal "chores" for the defendant that counsel would normally carry out. Even at the trial level, therefore, the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer.

*Martinez*, 528 U.S. at 161-162 (citations and footnote omitted).

Neither the trial court nor the state appellate court referenced *Faretta* or *Martinez* in evaluating Petitioner's request to represent himself.  Instead, the state appellate court relied on *People v. Dunigan*, 831 N.W.2d 243 (Mich. Ct. App. 2013) which, in turn, relied on *People v. Anderson*, 247 N.W.2d 857 (Mich. 1976).  In *Anderson*, the Michigan Supreme Court established three requirements that must be met before a criminal defendant in Michigan can proceed pro se:

First, the request must be unequivocal . . . . Second, once the defendant has unequivocally declared his desire to proceed Pro se the trial court must determine whether defendant is asserting his right knowingly, intelligently and voluntarily. . . . The third and final requirement is that the trial judge determine that the defendant's acting as his own counsel will not disrupt, unduly inconvenience and burden the court and the administration of the court's business.

*Anderson*, 247 N.W.2d at 859-860.  The *Anderson* court, however, drew its three requirements directly from the circumstances that swayed the *Faretta* court to recognize the right of self-representation.  *Id*. at 859 ("[T]he [*Faretta*] Court carefully noted the circumstances under which Faretta was deprived of his constitutional right to conduct his own defense.  The circumstances, affirmatively shown by the record, involved a clear and unequivocal request, weeks before trial, by a literate, competent, and understanding individual.") Thus, considering Petitioner's request for

11

self-representation under *Anderson* is consistent with, and not contrary to, clearly established federal law.

The trial court's treatment of Petitioner's request, measured against the requirements of *Anderson*, was deemed to be an appropriate exercise of the court's discretion. The court of appeals reasoned:

> Defendant made several requests to represent himself throughout the proceedings in the trial court.  The record demonstrates that defendant's pattern was to react and seek to represent himself only when he seemed dissatisfied with a statement by counsel or a ruling from the trial court.  At the beginning of the first trial, the trial court engaged in an extensive discussion with defendant regarding the seriousness of the charges he faced and the difficulties of representing himself. Defendant decided to continue with counsel.   This discussion substantially complied with *Anderson* and MCR 6.005(D).

> When defendant renewed his request to represent himself at the start of his second trial, again after receiving an unfavorable ruling from the court, the trial court responded as follows:

> THE DEFENDANT:  I want to fire my attorney.

> THE COURT:  Denied.  Have a seat.

> THE DEFENDANT:  Well, I'll represent myself then, how about that?

> THE COURT:  Have a seat, how about that?  Now, you can either behave, sir, in this courtroom and have a trial with your presence or you can have a trial without your presence.  That's my ruling.  Have a seat.

Although the trial court stated no findings in support of its ruling, it is clear from the record that, in light of defendant's identical request at the outset of the first trial, the trial court had concluded that defendant's request was not serious and that, accordingly, further consideration under *Anderson* and MCR 6.005(D) was unnecessary.  It is also clear from the trial court's comments that it was concerned that defendant's proposed self-representation posed a significant danger of disrupting the administration of the court's business, i.e., defendant's jury trial. Given defendant's outrageous behavior during pretrial proceedings, and his disregard for prior court orders, we believe that the trial court's concern in that regard was well founded.  Thus, we conclude that the trial court did not abuse its discretion by denying defendant's request to represent himself.

(Mich. Ct. App. Op., ECF No. 9-19, PageID.705-706.)

The Michigan Court of Appeals' determination finds ample support in the record. Viewed in isolation, the trial court's consideration of Petitioner's request on the first day of the second trial might seem inadequate and abrupt. Viewed against the criminal proceedings as a whole, however, the trial court's curt rejection of Petitioner's suggestion was entirely appropriate. Petitioner had rejected his counsel and sought to proceed on his own at virtually every opportunity. When the district court judge let Petitioner so proceed, it ended in a profane tirade. When the circuit court judge let him so proceed, it ended in a profane tirade, multiple contempt holdings, and removal from the courtroom. Nonetheless, when Petitioner made an unequivocal request on the first day of the first trial, after reviewing the charges and penalties, the court permitted him to represent himself with counsel continuing on as co-counsel. As she reviewed the requirements of going forward, however, Petitioner wavered. (*Id.*, PageID.300.) The court continued to review what would be required of Petitioner if he represented himself. Petitioner took a brief recess to speak with counsel and, ultimately, decided to proceed with counsel.

When Petitioner voiced his dissatisfaction with counsel again on the first day of the second trial, although Petitioner's desire to stand alone may have been voluntary and knowing, it was far from unequivocal. Petitioner's "How about that?" sounded more like a petulant retort to the court's denial of Petitioner's request for a transcript "correction" than any certain request for self-representation. Moreover, Petitioner's history of uncontrolled outbursts in the courtroom and the concomitant risk of mistrial augured against giving Petitioner the opportunity to give effect to his suggestion.

The state courts' refusal to permit Petitioner to represent himself at trial was entirely consistent with--not contrary to, or an unreasonable application of—clearly established federal

law.  The state appellate court's factual assessment of the record in support of its analysis is also eminently reasonable.  Accordingly, Petitioner is not entitled to habeas relief on his claim that he should have been permitted to represent himself.

    IV.    Substitute counsel

    The Sixth Amendment provides a criminal defendant with the right "to have the Assistance of Counsel for his defense."  U.S. Const., amend. VI.  One element of that right is the right to have counsel of one's choice.  *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006).  However, the right to counsel of choice is not without limits.  *Id.* at 148; *United States v. Mooneyham*, 473 F.3d 280, 291 (6th Cir. 2007).  "[T]he right to counsel of choice does not extend to defendants who require counsel to be appointed for them."  *Gonzalez-Lopez*, 548 U.S. at 151 (citing *Wheat v. United States*, 486 U.S. 153, 159 (1988), and *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989)).

    "'An indigent defendant has no right to have a particular attorney represent him and therefore must demonstrate "good cause" to warrant substitution of counsel.'"  *Mooneyham*, 473 F.3d at 291 (quoting *United States v. Iles*, 906 F.2d 1122, 1130 (6th Cir. 1990)); *see also Caplin & Drysdale*, 491 U.S. at 624 ("[T]hose who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts.").  "Good cause" for a substitution exists where there is "a conflict of interest, a complete breakdown in communication, or an irreconcilable conflict."  *Stadler v. Berghuis*, 483 F. App'x 173, 178 (6th Cir. 2012) (quoting *Wilson v. Mintzes*, 761 F.2d 275, 280 (6th Cir. 1985)); *see also Lakin v. Stine*, No. 99-1529, 2000 WL 1256900, *5 n.2 (6th Cir. July 13, 2000); *Morton v. Foltz*, No. 84-1813, 1985 WL 14072, *1 (6th Cir. Dec. 11, 1985).  Disagreements over strategy do not

14

suffice to establish good cause. *See, e.g., United States v. Johnson*, 612 F. App'x 345, 352 (6th Cir. 2015); *United States v. Herrera*, 636 F. App'x 2d 250, 255 (6th Cir. 2016).

The Michigan Court of Appeals analysis of Petitioner's challenge tracks clearly established federal law:

> The right to counsel is guaranteed by both the Fifth and Sixth Amendments to the United States Constitution, US Const, Ams V and VI; Const 1963, art 1, §§ 17 and 20.  The state must appoint counsel for an indigent defendant who requests counsel, *People v Jackson*, 483 Mich 271, 278; 769 NW2d 630 (2009), but an indigent defendant is not entitled to choose his own counsel, *People v Russell*, 471 Mich 182, 192 n 25; 684 NW2d 745 (2004) ("Defendant did not have the right to a third appointed counselor, because no defendant is entitled to the appointed counselor of his choice.").  The appointment of substitute counsel is warranted only if the defendant shows good cause and if substitution of counsel would not unreasonably disrupt the judicial process.  *Strickland*, 293 Mich App at 397.

> Defendant argues that his trial counsel's refusal to honor his request to obtain and use the Ottawa County telephone calls constituted a serious disagreement regarding trial strategy that destroyed the attorney-client relationship and warranted the appointment of substitute counsel.  We disagree.  "Counsel's decisions about defense strategy, including what evidence to present and what arguments to make, are matters of trial strategy, and disagreements with regard to trial strategy or professional judgment do not warrant appointment of substitute counsel."  *Id*. at 398 (footnotes omitted).  Accordingly, the trial court did not abuse its discretion by denying defendant's requests to appoint a fourth attorney.

(Mich. Ct. App. Op., ECF No. 9-19, PageID.706.)

The disagreement between Petitioner and his counsel centered on counsel's refusal to pursue discovery regarding, and introduce into evidence, telephone conversations between Petitioner and the victim that occurred while he was detained in the Ottawa County Jail.  As set forth fully below, counsel's decision to forego introduction of those conversations was strategic in that the conversations would have informed the jury of other offenses Petitioner had committed and the benefit of the victim's possibly exculpatory statements regarding her vengeful motive for reporting the incident were outweighed by Petitioner's plainly inculpatory statements regarding his conduct on the night of the alleged abuse.

15

Moreover, no matter how piqued Petitioner may have been with his counsel before the second trial, he was satisfied with counsel's performance by the time the prosecutor had put on her entire case.  The colloquy to determine whether Petitioner's decision to testify was knowing and voluntary included the following exchange:

> Q.    And I understand that prior to this trial you wanted to fire [trial counsel] but I said no and we're going to trial because it was last minute.  But so far have you been happy with what he had done and his advice to you?
>
> A.    Yes I have your Honor.

(Trial II, Tr. III, ECF No. 9-17, PageID.607-608.)  Petitioner was under oath when he made that statement.

The state appellate court's determination that the differences between counsel and Petitioner with regard to the Ottawa County Jail telephone recordings were matters of trial strategy and that such differences do not constitute good cause for a substitution of counsel are well-supported by the record and consistent with, and a reasonable application of, clearly established federal law.  Accordingly, Petitioner is not entitled to habeas relief based on the state court's refusal to provide substitute counsel.

## V.    Trial counsel's refusal to obtain impeachment evidence

Petitioner contends his counsel's refusal to obtain and introduce the content of the Ottawa County Jail recordings as impeachment evidence rises to the level of constitutionally ineffective assistance.  In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair

outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential.  *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011).  In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

The Michigan Court of Appeals considered Petitioner's claim under the following standard:

> Effective assistance of counsel is presumed, and the defendant bears a heavy
> burden of proving otherwise.  To establish an ineffective assistance of counsel

claim, a defendant must show that (1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different.  A defendant must also show that the result that did occur was fundamentally unfair or unreliable.

(Mich. Ct. App. Op., ECF No. 9-19, PageID.707.)  Although the court of appeals relied upon state authority, the standard applied is essentially identical to the *Strickland* standard and, if one follows the chain of Michigan cases, is expressly derived from *Strickland*.  *People v. Stanaway*, 521 N.W.2d 557, 687-688 (Mich. 1994).  Thus, the Michigan Court of Appeals applied the clearly established federal standard in deciding Petitioner's ineffective assistance claim.

Moreover, the state court of appeals applied the standard reasonably:

Defendant argues that trial counsel's failure to obtain the Ottawa County phone calls constituted ineffective assistance because it deprived him of a substantial defense, i.e., it prevented the jury from hearing Baker state that her allegations in the instant case were "payback" and thus deprived him of the opportunity to attack Baker's credibility.

We conclude that trial counsel did not render ineffective assistance.  Counsel's decision to not use the Ottawa County phone calls to prevent the jury from learning that defendant was incarcerated on other charges constituted trial strategy.  Defendant wanted counsel to impeach Baker with her statement that the charges in the instant case constituted "payback" for defendant wrecking her truck.  On cross-examination, however, defense counsel impeached Baker with her testimony from the preliminary examination and the first trial, and demonstrated that her testimony at the second trial was substantially different from what she gave previously.  And as we have already explained, in context, the "payback" comment has little or no impeachment value.

Moreover, defendant's argument fails to recognize that the Ottawa County recordings contain a great deal of inculpatory material.  Defendant argues that such material might have been excluded under MRE 403 as more prejudicial than probative.  We will not, however, substitute our own judgment on that strategic decision for the judgment of defendant's trial counsel.  *See People v Matuszak*, 263 Mich App 42, 58; 687 NW2d 342 (2004).  Indeed, given the risk of an adverse evidentiary ruling, we conclude that counsel's trial strategy was prudent.  The Ottawa County recordings contain defendant's admissions that (1) he was first imprisoned for an offense when he was 19 years old, (2) he was incarcerated in Ottawa County for gun-related charges, (3) he was drinking on the evening in question and has a substance abuse problem, and (4) while at the park with Parker,

he placed his hands on her throat and pushed her, leaving bruises.  Additionally, defendant's overall tone toward Baker in the recordings is both profane and verbally abusive.  There are hints of former domestic violence, and at one point Baker accuses him of leaving scars on her face in a former incident.  She also states that she is afraid of defendant, that he threatened to kill her and her dog on the evening in question, and that he repeatedly said, "I should break every bone in your body."  Finally, in the recordings, defendant openly asks Baker to refuse to testify, advising her that disobeying her subpoena would not subject her to criminal prosecution.  Hence, defendant has not overcome the presumption that counsel's refusal to offer the recordings as evidence was reasonable trial strategy.

(Mich. Ct. App. Op., ECF No. 9-19, PageID.707-708.)

The Ottawa County Jail recordings appear in the record as part of the court of appeals pleadings.  (ECF No. 9-19, PageID.812-817; ECF No. 9-20, PageID.818-852.)   The state court's description of the content of the recordings is well-supported in the record.  Even if the recordings might have revealed that the victim had reason to be vengeful because Petitioner destroyed her vehicle, the recordings would have also revealed that Petitioner had an even more significant record of criminal offenses than was already before the jury, and the recordings would have impeached Petitioner's sworn testimony regarding the events of that night.  The state court's determination that counsel's decision to forego introduction of the recordings was not only strategic, but also reasonable, is itself eminently reasonable.  Accordingly, Petitioner is not entitled to habeas relief on his ineffective assistance claim.

VI.    Prosecution's failure to correct false and perjured testimony

Finally, Petitioner contends that his trial was rendered fundamentally unfair by the prosecutor's failure to correct false and perjured testimony.  The Supreme Court repeatedly has recognized that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'"  *Giglio v. United States*, 405 U.S. 150, 153 (1972) (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)).  To establish such a prosecutorial misconduct claim, Petitioner must show "(1) the statement was actually false;

(2) the statement was material; and (3) the prosecution knew it was false." *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989) (citations omitted).  *See also Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998).  Petitioner bears the burden of demonstrating that the testimony was actually perjured.  *Lochmondy*, 890 F.2d at 822.  "[M]ere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony."  *Id.*

The Michigan Court of Appeals rejected Petitioner's "perjured testimony" claim at the first step:

> Defendant asserts that testimony given by Baker and her father, which indicated that Baker had a black eye following the incident at the park with defendant, was actually false because the police report did not mention a black eye and the photos taken by the police did not show that Baker had a black eye. Defendant contends that the false testimony was material because it related directly to the charge of domestic violence, and he asserts that the prosecutor knew that the testimony was false because at the preliminary examination the police officer who took a statement from Baker did not report that Baker had a black eye.  Defendant emphasizes that the prosecutor did not correct the false testimony given by Baker and her father, and concludes that this false testimony resulted in the jury convicting him of domestic violence.

> Defendant's argument is meritless.  Baker stated that that [sic] she sustained a cut lip that turned black and blue at some point after the incident, and that she "ended up" with a black eye.  On cross-examination, her father stated that Baker's eye appeared black to him, further stating that her skin was discolored underneath her eye and around her cheek bone.  A fair reading of Baker's testimony indicates that bruising developed on her lip and eye after some time had passed.  It is possible that the bruising had not yet fully developed when Baker spoke to the police and had her picture taken.  Thus, defendant has not established that the testimony given by Baker and her father regarding the condition of Baker's eye was actually false, let alone that the prosecution knew such testimony to be false.  Therefore, defendant's instant claim of error necessarily fails.

(Mich. Ct. App. Op., ECF No. 9-19, PageID.708-709.)  The state court's determination of the issue is entirely consistent with, not contrary to or an unreasonable application of, clearly established federal law.  Moreover, the court's factual determinations with regard to the victim's testimony,

the father's testimony, and inferences from that testimony are reasonable on this record.  Petitioner

has failed to identify any "false" testimony; therefore his argument is meritless.

### Certificate of Appealability

Unless a certificate of appealability is issued, an appeal of the denial of a habeas

corpus petition may not be taken.  28 U.S.C. § 2253(c)(1).  A certificate should issue if Petitioner

has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C.

§ 2253(c)(2).  The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of

a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001).  Rather, the district

court must "engage in a reasoned assessment of each claim" to determine whether a certificate is

warranted.  *Id.* at 467.

I have examined each of Petitioner's claims under the standards set forth by the

Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  Under *Slack*, to warrant a grant of the

certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's

assessment of the constitutional claims debatable or wrong."  *Id.*  "A petitioner satisfies this

standard by demonstrating that . . . jurists could conclude the issues presented are adequate to

deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In

applying this standard, the Court may not conduct a full merits review, but must limit its

examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

I find that reasonable jurists would not conclude that this Court's denial of

Petitioner's claims is debatable or wrong.

**Recommended Disposition**

      For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.  I further recommend that a certificate of appealability be denied.  *See Slack v. McDaniel*, 529 U.S. 473 (2000).


Dated:  March 5, 2018                   /s/ Ray Kent
                                      United States Magistrate Judge

**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(c); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).